UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

TARA GRAVES,

                          Plaintiff,          **No. 11-CV-6519(MAT)**
            -vs-                               **DECISION AND ORDER**

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                          Defendant.

---

## I.   Introduction

Represented by counsel, plaintiff Tara Graves ("Graves" or "Plaintiff") brings this action pursuant to Title XVI of the Social Security Act, seeking review of the final decision of the Commissioner of Social Security ("the Commissioner") denying her application for Supplemental Security Income ("SSI") benefits. For the reasons that follow, the Commissioner's decision is affirmed.

## II.   Factual Background and Procedural History

Plaintiff's initial application for benefits, filed on March 6, 2009, was denied. Benefits were denied again on May 25, 2011, following an administrative hearing before an Administrative Law Judge ("ALJ"). The relevant evidence of record is summarized below.

### A.   Plaintiff's Testimony

In her testimony at the hearing before the ALJ, Graves stated she graduated from high school with an Individualized Education

Program diploma and, since adolescence, has been variously diagnosed with anxiety, depression, attention deficit hyperactivity disorder ("ADHD"), and a learning disability. Graves asserts that she is unable to work because of her anxiety, depression, and learning disability. Graves testified that she "can't even read . . . a baby book"; that she can only do basic math and most of the time has to use a calculator. (22).[1] She requires assistance in filling out job applications and is unable to pay for things on her own as she cannot count money. (22). Her last job was as a childcare worker with the Wayne County Action Program which she had to quit due to her severe anxiety. (23).

Graves testified that she requires consistent assistance from her grandmother and her caseworker to care for herself and her two children. (24). Her grandmother helps her read her mail. If Graves is not feeling good and cannot leave the house, her grandmother will go grocery shopping for her. (24-25).

Graves explained that she had been seeing Cathy Bump ("Bump"), a licensed social worker, twice a week for mental health therapy, but "she wasn't really helping" anymore. (26). Graves stated that for a while, Bump was writing to the Wayne Count Department of Social Services ("DSS") saying she was unable to work because of her bad anxiety and her inability to leave the house. (26). Now,

---

[1]

Numbers in parentheses refer to pages from the administrative record.

however, Bump said that Graves "need[s] to go back to work because [Bump] can't help [her]." (26). Graves said that Bump was not listening to her problems but was "just assuming" things. (26).

Graves explained that she has suffered from anxiety since high school and would become anxious when asked to perform an academic task. (27). She explained, "I felt, like, I was going to fail, and everybody was watching me. 'Cause I can't read. And I can't spell at all. So, I just, broke down, just like I couldn't do it. And that's why I had real bad anxiety when I went to school." (27). The anxiety worsened after she had her son. (26). It is hard for her to breathe, her mouth gets "all tingly", and she "start[s] to . . . break down and cry", and she has to sit down because she feels as if she is going to pass out. (26). Those symptoms were why she left her daycare job. (26).

Graves stated that she "can't stop gaining weight". (27). She had been speaking with her doctor about undergoing gastric banding surgery. (27). She explained that her excess weight is causing her to have a lot of pains in her arms and hands, and that she has difficulty holding her eighteen-pound child for very long. (27). Graves takes medication for high cholesterol. (28).

**B.    Evidence Regarding Plaintiff's Mental Impairments**

**1.    School Records**

In eighth grade, Graves was classified as Multiply Disabled with Wechsler IQ scores of 85 (full scale), 84 (verbal), and 89

(performance). Looking at her total academic achievements in terms of grade equivalent, she was functioning at the 4.8 grade level at age seventeen. (154). In the eleventh grade, Graves was diagnosed with ADHD and medicated with Adderall. She was classified as having a learning disability in the areas of math, reading comprehension, basic reading skills, and written expression. (152).

Her overall reading ability, broad written language skills, and mathematics skills all were in the low range of ability. (155). Her Individualized Educational Program, completed at age nineteen, states that her memory for verbally-presented information was limited in all areas, as she became easily confused with multi-step directions and word problems. In mathematics, she had difficulty remembering and applying formulas, especially those that had been previously taught. (148). With guidance, however, Graves would complete assignments thoroughly, and she was "willing to try new approaches and strategies, often resulting in a better understanding of the concepts, as well as a reminder of her ability." (148). At that point in time, the plan was for Graves to continue to work at the Palmyra Community Center and apply for part-time employment at a local childcare center. (147).

## 2.   Non-Physician Treating Sources

Beginning in September 2007, Graves sought treatment from the Wayne Behavioral Health Network ("WBHN") for treatment of her adjustment disorder with mixed anxiety. (234-36). Graves attended

-4-

individual counseling sessions with licensed social worker Bump until November 2007. (235). Bump noted that Graves attended counseling appointments until she signed Graves' disability papers for the DSS in November 2007. (235, 293). Graves cancelled her next appointment and missed all subsequent appointments. (235). In her notes, Bump stated that she only sent out a "three month note" for disability benefits, as she was "having doubts about [Graves'] credibility." (236). Bump closed Graves' case on January 15, 2008. (236). In a discharge summary completed that date, Bump assessed that Graves' global assessment of functioning ("GAF") score was 54 (234),[2] which signifies moderate symptoms or moderate difficulty in social, occupational or school functioning.

On January 24, 2008, Graves, who was pregnant with a due date of March 23, 2008, returned to the WBHN and indicated that she wanted to re-start counseling with Bump due to continuing problems with depression, anxiety, and panic attacks. (221). Graves explained that she had missed several appointments because her grandmother had been unable to drive her. In her treatment notes from February 25, 2008, Bump indicated that Graves was having

_____

[2]

A person's GAF is described as a "clinician's judgment of the individual's overall level of functioning" taking into account "psychological, social and occupational functioning on a hypothetical continuum of mental health-illness." Diagnostic and Statistical Mental Disorders 32, 34 (4th ed., Text Revision 2000). A GAF of between 51 and 60 indicates "[m]oderate symptoms (e.g .... occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning ( e.g. few friends, conflicts with peers or co-workers)." Id. at 34 (capitals in original)

feelings of anxiety and panic when in public because she thought people were making comments about her weight and body-piercings. (221). Graves told Bump that there were periods of time when she would oversleep and cry a lot because she felt overwhelmed. (221). Graves was not presently having thoughts of suicide but reported having fears of car wrecks and other catastrophes. (221).

The WBHN records indicate that Graves started cognitive behavioral therapy with Bump on March 17, 2008, for forty-five minutes biweekly with the goals of increasing her insight, decreasing her symptoms, and increasing her ability to participate in the community. (230). Psychiatric evaluation was recommended after the birth of Graves' baby. The next appointment was scheduled for late April 2008. (221).

The WBHN records are rather sparse. Bump completed a diagnostic review on July 2, 2008, stating as follows: Axis I (Clinical Syndromes/V Codes): DSM 300.00, Anxiety D/O NOS; Axis II (Developmental/Personality Disorders): DSM 799.99, Diagnosis Deferred; and Axis III (Physical Discords/Conditions): DSM 278.0, Obesity. (231). Psychosocial and environmental factors that affected Graves' diagnosis were her pregnancy, social problems, and lack of family support. (221).

The next treatment note in the WBHN records is dated October 21, 2008, and is a "Review" of Graves' case which reads, in pertinent part, as follows:

-6-

> She now reports Panic Attacks-chest pains and trouble breathing in large places with lots of people. Tara reports a history of problems sleeping and crying spells. She also reports irrational fears-car crashes and other catastrophes. She denies leaving the house much due to these fears. Her baby is due in about 3 weeks. . . . She is working with DSS and the Wayne ARC-LIVES pro[gram]. They will help her find work after her baby is born. Tara gave no indication of psychosis denied current SI or HI. She appears to be somewhat intellectually limited, has fair judgment and poor insight. Tara behaves socially more like a young teenager than her stated age. Tara does admit to worrying, having trouble getting up, becoming angry easily and feeling overwhelmed although she appears calm. . . . Symptoms are moderate-she avoids leaving home but will with assistance. . . . Symptoms mild to moderate. Symptoms once [sic] when in community. Continue to assess cause. Initial diagnosis: Anxiety DO, NOS.

(229). Also in the October 21st note, Bump observed that Graves' attitude was cooperative; her speech was spontaneous; her thought form was focused; her mood was anxious though her affect was appropriate; her orientation and memory were intact though concentration was impaired, and her insight and judgment were poor. (228-29). Bump assessed Graves' symptoms at that time as mild-to-moderate and diagnosed Graves with anxiety disorder, not otherwise specified ("NOS"). (229).

The only other records from Bump or the WBHN are Psychiatric Report (Employment) forms which were completed on Graves' behalf for the DSS from November 2007 to January 2011. (293-299). In August 2008, April 2008, and October 2008, Bump indicated that Graves was not capable of  working in any capacity due to her anxiety disorder, not otherwise specified. (294-296).  In October 2009 and May 2010, Bump indicated that Graves was not capable of

working in any capacity due to her panic disorder with agoraphobia. (297).

In January 2011, Bump gave diagnoses of anxiety NOS and depression NOS. (299). However, Bump determined that Graves was capable of returning to work full-time. (299). Five months later, a new individual, Debbie Dinson-Moore, LMS, completed the Psychiatric Report (Employment) form for Graves, stating that she could <u>not</u> work in any capacity due to her "anxiety" and "limited cognitive abilities". (301). It appears that these Psychiatric Report (Employment) forms were not before the ALJ. However, they later were filed with Graves' appeal to the Appeals Council.

### 3.   State Agency Medical Consultants

#### a.   Dr. Jeanne A. Shapiro

Jeanne A. Shapiro, Ph.D., consulting psychologist, examined Graves at the Commissioner's request on April 6, 2009. Dr. Shapiro stated that Graves

> may have difficulty adequately understanding and following simple instructions and directions; completing some tasks given that she complains of learning disabilities and memory problems." She may have difficulty interacting appropriately with others as she does not leave home. Attending worker [sic] maintaining a schedule may be difficult for the same reason. She does not appropriately manage stress.
>
> Results of the examination are partially consistent with allegations. She has experienced panic attacks which affect her overall daily functioning. . . .

(241). Dr. Shapiro diagnosed panic disorder with agoraphobia but did not find that Graves' depressive symptoms warranted a formal diagnosis. (241). According to Dr. Shapiro, Graves "prognosis is better with more comprehensive treatment, and it is hoped that with more comprehensive intervention and support, she will find symptom relief and maximize her abilities." (241).

### b.   Dr. E. Kamin

On April 10, 2009, Dr. E. Kamin reviewed Graves' record (but did not examine Graves) and completed a Mental Residual Functional Capacity Form ("MRFC") and Psychiatric Review Technique Form ("PRT"). Dr. Kamin described Graves as having panic attacks and social anxiety and stated that her intellectual functioning appeared to be in the average range in light of her previous IQ scores. He noted that "[v]ocationally, the clmt appears to be capable of following, understanding, and remembering simple instructions and directions. Clmt appears capable to performing [sic] simple and complex tasks indepdentently. Not working closely with others would be appropriate for this clmt." (200).

### c.   Dr. Stephen Kleinman

Dr. Stephen Kleinman, a State agency psychiatric consultant, completed a Medical Consultant's Review of the PRT and a Medical Consultant's Review of the MRFC. (243-247). Dr. Kleinman essentially concurred with Dr. Kamin's assessment as to Graves' "Understanding and Memory", "Sustained Concentration and

Persistence", and "Social Interaction". (246). However, Dr. Kleinman noted that Dr. Kamin's narrative in the MRFC with regard to the area of "Adaptation" was "Incomplete or Inadequate" (246), explaining that "[o]verall, it appears that the claimant would possess the capacity to get to and from work on her own." (247). Dr. Kamin had found that Graves was "moderately limited" in her ability to get to and from work independently.

### C.   Evidence Regarding Plaintiff's Non-Mental Impairments

Dr. Zachary Freedman, an endocrinologist, examined Graves in November 2008 regarding her complaints of obesity. (179-82). At that point, Graves weighed 281 pounds. (179). Although morbidly obese, Graves demonstrated normal muscle strength; her lungs were clear to auscultation; her heart sounds were normal with a regular rhythm; her arms and legs exhibited no clubbing, cyanosis, or edema; and her reflexes were normal. (181). Dr. Freedman diagnosed Graves with a metabolic syndrome. (181). Subsequent testing showed that Graves' obesity is not caused by an endocrine dysfunction. (Ex. 1F at 3-4).

When Graves saw physician's assistant John Koch ("Koch"), with the Wayne Medical Group ("WMG"), on November 20, 2008, he commented that "[t]hings are finally starting to come together for this patient[.]" (206). She had been seen by Dr. Freedman, and all providers were in consensus that she would benefit from an SSRI

type of antidepressant. At that time, Graves' weighed 286 pounds and had no complaints of pain.

Graves returned to see Koch on December 17, 2008. (203, 205). At that point, Graves had been taking 20 mg of Celexa[3] daily. Koch stated that she was doing "quite well" with her depression, "OCD", and anxiety. (205). With input from a dietitian, she modified her eating habits and had lost eight pounds in the past month. As a result of the weight lost, she was feeling "so much better." (205). She had no complaints of pain. (205).

Dr. Freedman conducted a follow up examination on January 13, 2009, at which time Graves stated that she was taking Celexa and that she felt better. (178). Without any attention to her meal planning or exercise, she had lost ten pounds. (178). They discussed the need for physical exercise in order to achieve continued weight loss and have more energy. (178).

On December 23, 2010, Graves expressed interest to Koch in gastric bypass surgery or a gastric banding procedure. At her appointment on February 9, 2011, with Koch, Graves had excellent range of motion at the shoulders, elbows, and wrists, notwithstanding her occasional reports of pain in her right upper

---

[3]

Celexa is an antidepressant used to treat depression, obsessive compulsive disorders, and panic disorders. See WebMD, available at http://www.webmd.com/drugs/drug-8603-Celexa+Oral.aspx?drugid=8603&drugname=Celexa+Oral (last accessed Oct. 2, 2012).

arm. She had no sensory deficits, and her strength was rated at 5/5. (252).

### D.   The Vocational Expert's Testimony

The ALJ asked Silvio Reyes, an impartial vocational expert ("VE"), to consider a hypothetical individual who is the same age, has the same level of education, and the same work experience as Graves. (30). The hypothetical individual was limited to performing simple, routine and repetitive tasks; and required a low-stress job defined as having only occasional decision-making, occasional changes in the work setting, and occasional direct contact with the public, co-workers, and supervisors. The ALJ then asked the vocational expert whether there were any light jobs available that such an individual could perform. VE Reyes opined that such a person could perform several such jobs, including (1) stamper (100,000 jobs nationally), (2) laundry sorter (600,000 jobs nationally), and (2) ironer (500,000 jobs nationally). These jobs are listed in the U.S. Department of Labor's Dictionary of Occupational Titles ("DOT"), 4th ed. rev. 1991. (31).

### E.   The ALJ's Decision

The ALJ found that Graves was a younger individual within the meaning of the Act and had not engaged in substantial gainful activity since January 6, 2009. (41). Although the ALJ determined that Graves has a number of severe impairments (i.e., panic disorder with agorophobia, depression, ADHD, and morbid obesity),

she does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (41). In making this determination, the ALJ considered Listings 12.04C (Affective Disorders) and 12.06B and 12.06C (Anxiety-Related Disorders) in the Listing of Impairments. (42).

Listing 12.06B requires at least two of the following: marked restriction of activities of daily living ("ADLs"); marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration. The ALJ found that Graves has (1) mild restrictions in ADLs given her need for assistance with managing money and reading written materials; (2) moderate difficulties in social functioning; and (3) moderate difficulties in persistence concentration or pace. The ALJ found no record of episodes of decompensation. Therefore, Listing 12.06B was not satisfied. (42).

Listings 12.04C and 12.06C were not satisfied, the ALJ found, because the record failed to show evidence of repeated episodes of decompensation, evidence that Graves would suffer a decompensation episode with a minimal increase in mental or life demands, or the inability to function outside a highly supportive living arrangement or outside the area of Graves' home. (42).

The ALJ proceeded to evaluate Graves' Residual Functional Capacity ("RFC"), taking into account her obesity (she is 5'6" and weighed 280 pounds and at the time of the hearing), anxiety with agoraphobia, depression, ADHD, and learning disability. (43-44). The ALJ concluded that Graves has the RFC to perform light work except that she is limited to simple, routine, and repetitive tasks; she requires a low stress job (i.e., one that has only occasional decision-making and occasional changes in work setting); and she should have only occasional direct interaction with the public, coworkers, and supervisors. (43-47).

## III. Applicable Legal Standards

### A.   Standard for Eligibility for Supplemental Security Income

To establish disability under the Act, a plaintiff bears the burden of demonstrating (1) that she was unable to engage in substantial gainful activity by reason of a physical or mental impairment that could have been expected to last for a continuous period of at least twelve months, and (2) that the existence of such impairment was demonstrated by evidence supported by medically acceptable clinical and laboratory techniques. 42 U.S.C. § 1382c(a)(3); see also Barnhart v. Walton, 535 U.S. 212, 215 (2002).

To determine disability, the Commissioner uses a five step sequential evaluation process. 20 C.F.R. § 416.920; see also Williams v. Apfel, 204 F.3d 48, 48-49 (2d Cir. 1999). The burden of

proof is on the claimant at the first four steps of the evaluation. Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996). If the claimant establishes that she is unable to perform any of her past relevant work, the burden shifts at the fifth step to the Commissioner, who must then determine whether the claimant is capable of performing other work which exists in significant numbers in the national economy. 20 C.F.R. § 416.920; see also Bapp v. Bowen, 802 F.2d 601, 604 (2d Cir. 1986).

**B.   Scope of Review**

Any individual may appeal from a final decision of the Commissioner of Social Security to a United States District Court. 42 U.S.C. § 405(g). "[A]fter reviewing the Commissioner's decision, a court may 'enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding 18 the cause for a rehearing.'" Butts v. Barnhart, 388 F.3d 19 377, 384 (2d Cir. 2004) (quoting 42 U.S.C. § 405(g)).

"It is not [the reviewing court's] function to determine de novo whether [a plaintiff] is disabled. . . ." Pratts v. Chater, 94 F.3d 34, 37 (2d Cir. 1996). Instead, an ALJ's will be set aside "only where it is based upon legal error or is not supported by substantial evidence." Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." <u>Pratts</u>, 94 F.3d at 37 (quoting
<u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971)) (internal
quotation marks omitted)).

## IV.   Discussion

### A.   Failure to Adequately Develop the Record

Plaintiff contends that the ALJ failed to develop the evidence
of record because she did not obtain updated reports from Bump of
the WBHN, despite her offer at the hearing to obtain updated
treatment records from Koch and Bump. (17). Plaintiff specifically
notes that "[n]o request was made [to Bump or the WBHN] for a
mental RFC report and no request was made for employability
assessment reports, which were completed for the Department of
Social Services." Dkt #8-2 at 10. Defendant responds that the ALJ
obtained updated treatment records from Koch as well as records
from several of Graves' other medical sources. (250-92). Defendant
argues that the ALJ has the discretion to decide when the record is
complete, and the ALJ reasonably concluded that the record was
sufficient even without the missing records from the WBHN.

Plaintiff is correct that the ALJ has an affirmative duty to
assist the unrepresented claimant in developing the medical record.
<u>E.g.</u>, <u>Cruz v. Sullivan</u>, 912 F.2d 8 (2d Cir. 1990). Although an ALJ
must attempt to fill any "clear gaps" in the administrative record,
"where there are no obvious gaps . . . and where the ALJ already
possesses a 'complete medical history,' the ALJ is under no

-16-

obligation to seek additional information in advance of rejecting a benefits claim." Rosa v. Callahan, 168 F.3d 72, 79 n. 5 (2d Cir. 1999) (quoting Perez, 77 F.3d at 48).

Contrary to Plaintiff's assertion, it appears that the ALJ had before her all of the available treatment notes from the WBHN. Although the ALJ noted that the record did not reveal much about how often Plaintiff saw Bump for counseling, it was not because the ALJ was missing records. Rather, the records themselves are very sparse and do not contain any progress notes from Bump or any other therapist at the WBHN.

The Court agrees with Plaintiff that the ALJ failed to obtain the Psychiatric Report (Employment) forms completed by the WBHN on Graves' behalf for the DSS from November 2007 to January 2011. (293-299). As noted above, in August 2008, April 2008, and October 2008, Bump indicated that Graves was not capable of  working in any capacity due to her anxiety disorder, not otherwise specified. (294-296). In October 2009 and May 2010, Bump indicated that Graves could not work due to panic disorder with agoraphobia. (297). In January 2011, Bump indicated that Graves could return to work full-time. However, another individual, Debbie Dinson-Moore, LMS, completed the Psychiatric Report (Employment) form for Graves on May 19, 2011, stating that she could not work in any capacity due to her anxiety and depressive disorder. (301). These reports ultimately were submitted to the Appeals Council, which considered

-17-

them as part of the record and found that the ALJ's decision was not contrary to the weight of the evidence. (5). <u>See</u> 20 C.F.R. §§ 416.1470(b), 416.1476(b).

The Court finds that although the ALJ erred in ensuring that she had these records prior to issuing the decision, such error was harmless. <u>See</u> <u>Curry v. Sullivan</u>, 925 F.2d 1127, 1129 (9th Cir. 1996) (harmless error rule applies to review of denial of disability benefits). The omitted documents are simply forms containing the treating social worker's diagnosis and opinion, issued by checking the applicable box, that Graves is disabled from working. The disability forms completed by Bump do not contain any specific information about Graves' mental impairments and resultant limitations that would have been helpful to the ALJ in making her disability determination. Although the form completed by Moore does state that Graves cannot work because of her cognitive limitations and social anxiety symptoms, it is cumulative to the information already contained in the record. Furthermore, the regulations provide that the Commissioner "will not give any special significance to the source of an opinion on issues reserved to the Commissioner," including a statement by a medical source that the claimant is "disabled" or "unable to work[.]" 20 C.F.R. § 404.1527(d)(1), (3). The Court agrees with Defendant that the disability reports submitted by Bump and Moore from the WBHN would not have changed the ALJ's decision, and therefore the error in

-18-

obtaining these records prior to the hearing was harmless. See Seltzer v. Comm'r of Social Sec., No. 07-CV-0235 (CBA), 2007 WL 4561120, at *10 (E.D.N.Y. Dec. 18, 2007)("Nevertheless, to the extent that an ALJ fails in her duty to affirmatively develop the record and/or consider all of the relevant evidence, the court can still affirm her decision if this error is deemed to be harmless.") (citing, inter alia, Walzer v. Chater, 93 Civ. 6240, 1995 WL 791963, at *9 (S.D.N.Y. Sept. 26, 1995) ("While the ALJ should have discussed Dr. Leahy's report in his decision (even though her report was received after the close of the hearing), the ALJ's failure to do so was harmless error, since his written consideration of Dr. Leahy's report would not have changed the outcome of the ALJ's decision.").

**B.   Failure to Determine that Plaintiff's Learning Disorder Was a Severe Impairment**

To be "disabled" within the meaning of the Social Security Act, a claimant must have an impairment or combination of impairments that are "severe." 20 C.F.R. § 404.1520(a)(4)(ii), (c). An impairment is severe if it "significantly limits the claimant's ability to do basic work activities." 20 C.F.R. § 404.1520(c). "Basic work activities" is defined to "mean the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b). The "severity regulation," however, "is valid only if applied to screen out de minimis claims." Dixon v. Shalala, 54 F.3d 1019, 1030 (2d Cir. 1995).

Plaintiff argues that the ALJ erroneously failed to find that her learning disability was a severe impairment and erroneously failed to include any limitations pertaining to her intellectual deficits in the RFC determination. Defendant argues that this argument is moot because the ALJ, after finding that Plaintiff had several severe impairments, considered her non-severe impairments in conjunction with the severe impairments throughout the remainder of the sequential evaluation. <u>See</u> 20 C.F.R. § 416.923 (stating that whenever a claimant has a severe impairment, the ALJ considers the combined effect of all of the claimant's impairments, severe and non-severe, throughout the sequential evaluation). Defendant notes that the ALJ accounted for Graves' learning disability by limiting her RFC to performing simple, routine, and repetitive tasks with only occasional decision-making. (43).

There is "general support in the case law" for the proposition that the ALJ's severity assessment with regard to a given impairment is harmless because the ALJ continued with the sequential evaluation. <u>Zenzel v. Astrue</u>, No. 11-CV-259 (TJM/VEB), 2012 WL 3929895, at *5 (N.D.N.Y. July 6, 2012) (citing <u>McCartney v. Comm'r of Social Sec.</u>, No. 07-1572, 2009 WL 1323578, at *16 (W.D. Pa. May 8, 2009) ("Even if the Court was to find that the ALJ did err in excluding headaches from the list of severe impairments, any such error was harmless because the ALJ found other severe impairments at step two and proceeded through the sequential

evaluation on the basis of Plaintiff's severe and non-severe impairments.")). However, this type of "harmless error" finding "is appropriate only when it is clear that the ALJ considered the claimant's [impairments] and their effect on his or her ability to work during the balance of the sequential evaluation process." Id. (citing McCartney, 2009 WL 1323578, at *15).

Plaintiff is correct that a diagnosis of a learning disability can serve as an additional and significant impairment. See Williams v. Astrue, No. 07CIV4134JGK, 2008 WL 4755348, *10 (S.D.N.Y. Oct. 27, 2008) ("[A] learning disorder is a separate impairment from borderline intellectual functioning and it was necessary for the ALJ to have determined whether the learning disorder was correctly evaluated and whether it resulted in additional and significant limitations which were in fact different from borderline intellectual functioning."). Even assuming that Graves' learning disability constitutes a severe impairment, the Court agrees with Defendant that any error was harmless, since the ALJ included Graves' learning disability in her RFC analysis and analyzed the extent to which the resultant symptoms limited her functioning. The ALJ found that although the school records indicated that Graves "has limitation with regard to learning[,] and that her reading, writing, and mathematics skills are significantly lower that [sic] an average person her age, these [sic] evidence without more do not prove that she cannot perform simple work requiring minimal or no

writing, reading, and mathematics skills." (45). The ALJ also included the symptoms caused by Graves' learning disability in her questions to the VE by limiting the hypothetical claimant to performing "simple, routine and repetitive tasks" in a work setting requiring only "occasional" decision-making and "occasional" changes. (43). Because the ALJ considered Graves' learning disability and its effect on her ability to work during the balance of the sequential evaluation process, the Court finds that any error in step two's severity determination was harmless.

## C. **Failure to Properly Weigh the Opinions of the Medical Sources**

Plaintiff argues that the ALJ took an inconsistent approach to the report issued by consulting psychologist Dr. Shapiro. According to Plaintiff, the ALJ relied upon Dr. Shapiro's report to discount Plaintiff's allegations of anxiety and her inability to function socially, but then rejected Dr. Shapiro's opinions on Plaintiff's limitations, finding that they were not supported by the doctor's own findings and were based only on Plaintiff's statements. See Dkt. #8-2 at 12; (46).

The Court has reviewed Dr. Shapiro's note and finds that the ALJ did not take an inconsistent approach in connection with the doctor's medical source statement. To the contrary, Dr. Shapiro's medical source statement, to the extent that it is based on Plaintiff's own subjective complaints, appears to be inconsistent with Dr. Shaprio's independent assessment of Plaintiff's cognitive

functioning. Dr. Shapiro stated in relevant part that "[v]ocationally," Graves "may have difficulty understanding and following some instructions and directions as well as completing some tasks given that she complains of learning disabilities and memory problems." (241) (emphases supplied). However, Dr. Shapiro stated that Graves' "intellectual function is estimated to be in the average range" and her "general fund of information appears to be appropriate to experience." (240). Dr. Shapiro further found that Graves' attention and concentration were "intact" and she was "able to do counting, simple addition and subtraction, and serial 3s." (240). Finally, Dr. Shapiro assessed Plaintiff's insight and judgment both as "fair". (240).

Plaintiff argues that the ALJ "is in no position to determine that Dr. Shapiro based her opinions solely upon the plaintiff's subjective complaints." Dkt #8-2 at 12 (citation omitted). However, the excerpts quoted above from Dr. Shapiro's note, reasonably read, indicate that her tentative conclusions (i.e., that Graves may have difficulties) about Graves' cognitive and social functioning were based on Graves' own statements about her learning disability. See (241).

Dr. Shapiro also stated in her medical source statement that Plaintiff "may have difficulty interacting appropriately with others because she does not leave home. Attending worker [sic] maintaining [sic] a schedule may be difficult for the same reason."

(241) (emphases supplied).[4] This statement does not say anything about the effect of Plaintiff's anxiety disorder on her social functioning. Her stated refusal to leave the house may make interacting with others impossible or unlikely, but it is not, in and of itself, a reason for her to have difficulty interacting with others once he or she is outside the home. Indeed, Dr. Shapiro's observations support the opposite conclusion. She stated that Graves' demeanor and responsiveness to questions were "cooperative"; her manner of relating, social skills, and overall presentation were "adequate"; her affect was "congruent" with her thoughts and speech, and was of "full range"; she appeared "relaxed and comfortable", with a "calm" mood; and her thought processes were "coherent and goal directed with no evidence of delusions, hallucinations, or disordered thinking." (240).

Plaintiff is correct that an ALJ may not arbitrarily substitute her own judgment for competent medical opinion. Rosa v. Callahan, 168 F.3d 72, 79 (2d Cir. 1999). In the present case, the Court finds that the ALJ did not substitute her judgment as a layperson for Dr. Shapiro's opinion. Dr. Shapiro stated that Graves may have difficulties interacting with others; the ALJ limited Graves' RFC to having only occasional contact with co-workers and

---

4

Dr. Shapiro's medical source statement would have been more meaningful if she had identified specific psychological or mental impediments to Graves interacting in a socially appropriate manner and maintaining a work schedule.

the public. Dr. Shapiro stated that Graves "may have difficulty understanding and following some instructions and directions as well as completing some tasks"; the ALJ restricted Graves' RFC to performing simple, routine, and repetitive tasks. Although the ALJ stated that she gave Dr. Shapiro's report "little weight," the ALJ's RFC assessment is essentially consistent with Dr. Shapiro's conclusions.

### D.  Erroneous RFC Determination

Plaintiff argues that the ALJ's RFC assessment did not include a number of the limitations found by non-examining Agency consultant Dr. Kamin in his reports (the Psychiatric Review Technique ("PRT") and Mental Residual Functional Capacity ("MRFC") (184-201)). See Dkt. #8-2 at 13. In particular, Plaintiff asserts that the ALJ failed to include in her RFC determination areas in which Dr. Kamin found Graves be "moderately limited"–namely, the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and her ability to work in coordination with others or work closely with others. Dkt #8-2 at 13; see also (198).  Dr. Kamin found several other "moderate" areas of limitation, but the ALJ included those in her RFC assessment and hypothetical to the VE.

Contrary to Plaintiff's assertion, the ALJ did include the "moderate" limitation found by Dr. Kamin in regards to Graves' ability to work closely with others by finding that Graves should

be limited to having only occasional contact with co-workers and members of the public. Thus, the only "moderate" area of limitation that the ALJ did not include was Graves' ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances.

There is, however, "nothing in the commissioner's regulations or rulings that requires an ALJ to make findings concerning each of the limitations listed [in Section I] on the 'Summary Conclusions' portion of the [MRFC] forms utilized by the [State Agency Medical Consultants] in assessing a claimant's mental residual functional capacity." Huber v. Astrue, No. 4:07-CV-477-A, 2008 WL 4694753, at *7 (N.D. Tex. Oct. 22, 2008) (citing 20 C.F.R. §§ 404.1513(c), 416.913(c); Social Security Ruling 96-6p) & id. n. 5 ("[T]he 'Summary Conclusions' reported by the state agency medical consultants [SAMCs] in section I of the approved mental RFC assessment form are chiefly intended to serve as a worksheet for the SAMC's use, and it is the narrative functional capacity assessment written by the psychiatrist or psychologist in section III ('Functional Capacity Assessment') of the form that adjudicators must consider in terms of the claimant's ability to meet the mental demands of past work or other work.") (citing Social Security Administration, Program Operations Manual System § DI 25020.010).

Taken as a whole, the record does not indicate that the ALJ failed to consider the nonexertional limitations noted by Dr. Kamin. The ALJ did not ignore Dr. Kamin's opinion, and, in fact, the ALJ adopted Dr. Kamin's opinion almost in its entirety.[5] See Hickey v. Astrue, No. 4:09-CV-280-Y, 2010 WL 3835113, at *14 (N.D. Tex. Aug. 2, 2010) (finding no error where the record, taken as a whole, did not indicate that the ALJ failed to consider the nonexertional limitations noted by the SAMCs; ALJ's "'explanation of the weight assigned those opinions [was] consistent with the purposes of the regulations and rulings that govern the assessment of medical source opinions'") (quoting Huber, 2008 WL 4694753, at *8 ("The ALJ adhered to the internal administrative requirement in Huber's case by addressing and generally endorsing the narrative assessment that [SAMC] Lankford provided on the mental residual functional capacity form.")).

### E.   Improper Reliance on VE's Testimony

Plaintiff argues that the ALJ failed to identify conflicts between the testimony of the VE and the jobs in the DOT that the VE identified in relation to the limitations contained in the ALJ's hypothetical. See SSR 00-4p, 2000 WL 1898704 (SSA Dec. 4, 2000) ("When a VE . . . provides evidence about the requirements of a job

---

[5]   The ALJ rejected the portion of Dr. Kamin's opinion that was least helpful to Graves, that is, his conclusion that Graves could perform complex tasks independently. (200). The ALJ credited the reports of Graves' learning disability and limited Graves' RFC to the ability to perform simple tasks.

or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between that VE . . . evidence and information provided in the DOT."). When such conflicts arise, the ALJ must "[e]xplain in the determination or decision how any conflict that has been identified was resolved." SSR 00-4p, 2000 WL 1898703, at *2.

The ALJ limited Graves to "simple, routine and repetitive tasks" in "a low stress job . . . only having occasional decision making and occasional changes in the work setting. . . ." (30). The jobs identified by the VE were stamper (DOT 920.687-126), laundry sorter (DOT 361.687-014), and ironer (DOT 590.685-042). These have a general education/development reasoning level of "2". The DOT defines reasoning level two as having the ability to "[a]pply common sense understanding to carry out detailed but uninvolved written or oral instructions [and] [d]eal with problems involving a few concrete variables in or from standardized situations." Dictionary of Occupational Titles, U.S. Dept. of Labor, Office of Admin. Law Judges, App. C (4th ed. 1991). District courts in this Circuit have differed as to whether a reasoning level of 2 conflicts with a hypothetical limiting the claimant to simple, routine, and repetitive tasks. Contrast Santos v. Astrue, 709 F. Supp.2d 207, 212 (S.D.N.Y. 2010) (VE's testimony that the jobs described were not in conflict with DOT standards was not accurate where hypothetical individual was limited to "simple one or two

step tasks" but and "simple instructions", a description commensurate with a DOT reasoning development level of one, and VE described level two jobs; jobs described under a reasoning development level of two require the capacity to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions"); with Edwards v. Astrue, 07-CV-898, 2010 WL 3701776, at *15 (N.D.N.Y. Sept. 16, 2010) ("Working at reasoning level 2 does not contradict the mandate that work be simple, routine and repetitive.") (citing Money v. Barnhart, 91 F. App'x 210, 215 (3d Cir. 2004) (unpublished opn.)).

Here, Plaintiff did not graduate high school with a normal diploma, and at age seventeen, was intellectually functioning at a grade level of 4.8. The ALJ found that Graves could not perform complex tasks independently, given her documented learning disabilities. (46). However, Graves did have past relevant work as a childcare aide (semi-skilled, medium exertional, SVP 3) and a machine operator/packaging (unskilled, medium exertional, SVP 2). SVP stands for "specific vocational preparation", which refers to the amount of time it takes an individual to learn to do a given job. Rodriguez v. Astrue, No. 07 Civ. 534(WHP)(MHD), 2009 WL 637154, at *10 n.23 (S.D.N.Y. Mar. 9, 2009) (citation omitted). The ALJ credited the VE's testimony that Graves could not perform her past relevant work, but this appears to have been largely based

-29-

upon the limitations caused by Plaintiff's obesity and social anxiety rather than her intellectual functioning. (46).

Given that Graves did hold a job in the past that had an SVP of 2, and the three jobs identified by the VE all had SVPs of 2, there does not appear to be a clear conflict or discrepancy between the hypothetical individual described by the ALJ and the VE's testimony. In other words, I cannot say that the ALJ clearly erred in this regard.

**F.   Erroneous Determination of Plaintiff's Credibility**

Finally, Plaintiff argues that the ALJ erred in determining her credibility. Plaintiff's credibility arguably was undermined by the observation Bump that Graves attended counseling appointments only until Bump signed her disability papers in November 2007. (235, 293).  The ALJ, however, noted that to Graves' credit, she soon returned to the WBHN for additional mental health counseling and offered a reason for not making her appointments. Thus, it does not appear that the ALJ held this incident against Graves in assessing her credibility.

The ALJ also asserted that Plaintiff did not take her anti-anxiety medication (Celexa) regularly. However, the treatment note upon which the ALJ relied, when read in context, indicates that Plaintiff was to refrain from taking her Celexa until her endrocrine work-up was complete. (180, 206). The Court agrees with Plaintiff that the ALJ mischaracterized the record in this regard.

However, "because the ALJ's credibility analysis is otherwise supported by substantial evidence, this misstatement is nothing more than harmless error." <u>Rockwood v. Astrue</u>, 614 F. Supp.2d 252, 272 n. 34 (N.D.N.Y. 2009) (citing <u>Barringer v. Comm'r of Soc. Sec.</u>, 358 F. Supp.2d 67, 83 n. 26 (N.D.N.Y. 2005)).

## V.   Conclusion

After careful review of the entire record, and for the reasons stated, this Court finds that the Commissioner's denial of benefits was based on substantial evidence and was not erroneous as a matter of law. Accordingly, the ALJ's decision is affirmed. Defendant's motion for judgment on the pleadings (Dkt #10) is granted, and Plaintiff's motion for judgment on the pleadings (Dkt #8) is denied.

**SO ORDERED.**

S/Michael A. Telesca

_____

HONORABLE MICHAEL A. TELESCA
United States District Judge

Dated:     October 4, 2012
           Rochester, New York.